Argued and submitted January 6, affirmed March 9, petitions for review denied
May 26, 2016 (359 Or 667)

In the Matter of A. V.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. V.
and N. V.,
*Appellants.*

Baker County Circuit Court
5740J;
Petition Number 5740J01;
A160050

369 P3d 1231

Megan L. Jacquot argued the cause and filed the brief for appellant N. V.

Shannon Storey, Chief Defender, Juvenile Appellate Section, and Sarah Peterson, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant K. V.

Cecil A. Reniche-Smith, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Before Sercombe, Presiding Judge, and Tookey, Judge, and DeHoog, Judge.

SERCOMBE, P. J.

**SERCOMBE, P. J.**

Parents appeal a juvenile court judgment assuming jurisdiction over their child, A, pursuant to ORS 419B.100 (1)(c). The court took jurisdiction based on its determination that A's conditions and circumstances endangered her welfare because (1) mother abused S, another child in parents' care, causing S serious injury; (2) father is likely to fail to protect A from mother; (3) father's alcohol use interferes with his ability to safely parent A; and (4) father subjected mother and A to domestic violence, and he therefore presents a threat of harm to A. On appeal, parents do not challenge the court's decision with respect to mother but argue that the juvenile court erred in concluding that there was a risk of serious loss or injury to A that was likely to be realized if she were in father's care. The Department of Human Services (DHS) responds that there was sufficient evidence to support jurisdiction. We agree with DHS and, therefore, affirm.

On review of a jurisdictional judgment, "we view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013).[1] Specifically, the reviewing court will

"(1) assume the correctness of the juvenile court's explicit findings of historical fact if these findings are supported by any evidence in the record; (2) further assume that, if the juvenile court did not explicitly resolve a disputed issue of material fact and it could have reached the disposition that it reached only if it resolved that issue in one way, the court implicitly resolved the issue consistently with that disposition; and (3) assess whether the combination of (1) and (2), along with nonspeculative inferences, was legally sufficient to permit the trial court to determine that ORS 419B.100(1)(c) was satisfied."

---

[1] The parties in this case do not request *de novo* review, and, as we do not consider this to be an exceptional case, we decline to exercise our discretion to conduct such review. *See* ORS 19.415(3)(b) (allowing *de novo* review at the discretion of the Court of Appeals); ORAP 5.40(8)(c) (*de novo* review is to be conducted only in exceptional cases).

*Id.* at 639-40. We therefore state the relevant facts in accordance with that standard.

Mother and father have one child together, A, who was two years old at the time of the jurisdictional hearing. Mother was A's primary caregiver, and father worked long hours as a restaurant manager. He would often come home from work intoxicated, would get angry when he was intoxicated, and mother found his drinking to be upsetting. About eight months before the hearing, on August 2, 2014, father came home from work intoxicated and argued with mother, who had also been drinking. Mother had A in her arms during the argument. Father threw a heavy wallet at mother's back, knocking the wind out of her. Mother told father that she was leaving with A, and father tried to wrestle the car keys away from her while she was still holding A. Mother then fled to the bathroom with A, locked the door, and called 9-1-1. Father was "hollering, trying to get into the bathroom," until mother told him that she had called 9-1-1, and he left the house.

Father was arrested and charged with assault in the fourth degree, constituting domestic violence, and harassment. After father was charged, he was ordered by the court to have no contact with mother. Father, however, violated the no-contact order and was living with mother again by early September.

In early September, father, mother, and A travelled together to Idaho Falls, Idaho, to pick up father's niece, S, because father's sister was unable to care for her. S was about seven months old at that time. They then travelled to Nampa, Idaho, so that mother, A, and S could stay with mother's friend, Stone. Father returned to Oregon to work for a few days, came back to Nampa for a few days, and then returned to Oregon again before mother and the children. After father left Idaho the second time, Stone noticed bruises on S's forehead, which mother said were caused by S bumping her head on the bars of a crib. Stone also saw S get small bruises from bumping her head on the floor.

During the afternoon of September 20, about a week after mother and the children had returned to Baker City, mother called 9-1-1 and reported that S had fallen off

a bed and was unresponsive. Mother told first responders that she had put both S and A into her bed for a nap and left the room. Mother said that A had started crying and that she took A to another room to comfort her. Mother further stated that she had subsequently heard a thud, returned to the bedroom, and found S on the floor next to the bed. S was unresponsive, and mother was unable to revive her.

S was transported to a hospital in Baker City and subsequently moved by helicopter to a hospital in Boise. She had a subdural hematoma and retinal hemorrhages, and she sustained a severe brain injury as a result of her injuries, one that resulted in permanent and severe intellectual disability. Medical personnel concluded that a fall from a bed would not have caused S's injuries and that she had suffered abusive head trauma. Medical personnel also observed extensive bruising on S's chest, thighs, back, and forehead. The bruises were too recent to be the ones that Stone observed and were also more severe.

Father was interviewed by police about the incident. He told Officer Jayo that he had arrived at work around 9:00 a.m. on September 20 and that everything had been normal that morning before he left home. Mother, A, and S were all sleeping when he left. He was at work when S was injured. He also told Jayo that "he had no idea, never heard anything, seen anything, or knew anything that would have caused any issue" with respect to mother's parenting of S.

Two days after the injury to S, father pleaded guilty to harassment, and the assault charge was dismissed. Father was sentenced to probation and ordered to complete anger management training, undergo a substance abuse assessment, and complete any recommended services. Father was also ordered to have no contact with mother until he was enrolled in anger management. Father successfully completed anger management training, but he did not undergo any substance abuse treatment.

After the injury to S, DHS petitioned for jurisdiction over A due to concern that there was a risk of harm to A as a result of the serious unexplained injury to S. A was placed in the temporary custody of DHS, pending the

outcome of the jurisdictional trial. During the seven months before trial, mother and father separated; mother moved to Meridian, Idaho, and father remained in Baker City. A was assessed by DHS, and the agency concluded that she did not need counseling. However, during that time preceding the trial, a visitation specialist saw A behaving aggressively towards a baby doll. A said "shh, shh, shh," to the doll, "shaking, scolding, slapping and throwing" it on the ground. A's foster mother also saw her acting aggressively with the doll, shushing it and saying "[n]o baby, be quiet."

At trial, DHS relied on its second amended petition, which alleged:

"[A] is at risk of harm. Said child's parents were providing care of another child, [S] (8 months old). On or about September 20, 2014, [S] suffered an unexplained serious physical injury. Medical professionals at St. Luke's Regional Medical Center have indicated that [S] suffered a brain injury which is more likely than not due to non-accidental trauma. Due to the unexplained serious injury to [S], said child is at risk of harm.

"* * * * *

"The father's use of alcohol and/or controlled substances interferes with his ability to parent in that while under the influence of alcohol and/or controlled substances, the father has been unable and/or unwilling to provide the child with the care, guidance and protection necessary for the child's physical, mental and emotional well-being. If left untreated, the father's substance abuse presents a threat of harm to the child. [Father] has engaged in domestic violence with [mother] while intoxicated.

"* * * * *

"The father presents a threat of harm of physical abuse and/or mental injury to the child in that he has engaged in domestic violence in the presence of the child. If left untreated, his violent behavior presents a threat of harm to the child. [Father] was convicted of domestic violence and has been court ordered to complete Batterer's Education."

The juvenile court amended the third allegation to reflect the fact that father "was convicted of harassment, and was order[ed] to engage in anger management."

At trial, DHS presented expert testimony from Dr. McPherson who stated that mother's story about a fall from the bed did not explain S's injury and that S had been the victim of abusive head trauma. He also testified that there was no indication that S had a disorder that would have caused her to bruise easily, and, therefore, the bruises she had when she arrived at the hospital were most likely also caused by abuse. McPherson further opined that abuse of one child indicates that other children in the same household are at risk and that domestic violence in the household is a risk factor of child abuse. Mother presented testimony from an expert, Dr. Gabaef, who testified that S's injuries were more likely caused by viral encephalitis than abuse. The court found that McPherson's testimony was credible, that Gabaef's testimony was not credible, and concluded that mother had caused the injury to S. Therefore, the court found that the first allegation in the petition had been proved with respect to mother by a preponderance of the evidence.

As to father, DHS presented testimony from Smartt, a DHS child welfare caseworker, and father made no objection to the relevant portions of Smartt's testimony. Smartt testified that, although it was her "understanding" that father completed an alcohol assessment showing that he did not need substance abuse treatment, she had not been able to obtain a copy of the document because father had not signed the necessary release form. Further, she stated that she had received "community reports" that alcohol was still an "issue" for father, and that DHS's position was that father needed substance abuse treatment. She also testified that a batterer's education program, rather than anger management, was necessary to address the risk that father would engage in domestic violence in the future. Additionally, she testified that she had received "community reports" that father and mother were living separately and in the process of divorcing. Mother testified that she and father were no longer living together—she had moved to Idaho and he remained in Oregon—but did not testify as to whether they were getting a divorce.

The juvenile court found that the three allegations in the petition had been proved against father by a preponderance of the evidence. With respect to the first allegation

in the petition, the court found that father's past violation of the no contact order demonstrated that father was likely to allow A to have contact with mother. The court explained that the "absolute track record" showed that father was willing to ignore a court order and that, therefore, father was likely to ignore an order by the court to keep A away from mother. The court found that to be "very concerning" given "the danger that that poses to your daughter when I consider the danger that [S] suffered." Additionally, the court noted that the unexplained bruising to S occurred while father was living with mother and S.

Regarding the second and third allegations, the court concluded that father's past domestic violence was directed at both mother and A and was caused by father's alcohol abuse. The court also noted that, during the harassment incident, mother had protected A from father, and she would not be able to protect her in the future because of her abuse of S. The court concluded that mother had "minimized" the level of conflict between the parties in her testimony but that A's aggressive behavior with the doll demonstrated that A had been affected by the domestic violence between father and mother and A. The court found that there was no proof that father had undergone a substance abuse assessment and also that father needed substance abuse treatment in order to safely parent A. Further, the court explained that it was "not convinced that the anger management alone" was sufficient to address the threat of harm to A posed by father.

On appeal, parents do not challenge the juvenile court's determination that DHS proved its allegation with respect to mother. They contend, however, that the court erred with respect to father. They first argue that, at the time of the trial, any risk of harm to A due to the potential that father would fail to protect A from mother was speculative. Parents urge us to reach that conclusion because father and mother had been living separately since the injury to S, they were in the process of divorcing, and they had not had any contact in the seven months preceding the trial. Parents also contend that the substance abuse assessment demonstrated that father did not require treatment for alcohol abuse and that DHS also failed to prove a nexus between father's alcohol use and a current risk of harm to A. Further,

parents argue that DHS presented no evidence that father had engaged in violent behavior beyond the "isolated incident" that led to his harassment conviction and that DHS also failed to prove a nexus between domestic violence by father and a current risk of harm to A.

DHS responds that it presented sufficient evidence that father would fail to protect A from mother. DHS asserts that the juvenile court could reach that conclusion based on the evidence that father had previously violated an order not to have contact with mother, that S suffered unexplained bruising prior to her serious injury and while father was living with mother, and that father had not accepted that mother had injured S. Further, DHS contends that there was sufficient evidence from which the court could conclude that father's alcohol abuse created a risk of harm to A. DHS points out that the alcohol assessment was never made part of the record, and that there were "community reports" that alcohol was still a problem for father. DHS further argues that there was evidence from which the court could conclude that father's domestic violence created a risk of harm to A. DHS contends that the court could infer that the incident leading to father's harassment conviction was not an isolated incident of domestic violence, pointing to mother's statements that father was often intoxicated, became "angry" when intoxicated, and that his drinking upset her. DHS also argues that A's aggressive behavior towards her baby doll supports the conclusion that A had been exposed to and harmed by domestic violence in the home. Finally, DHS asserts that father's anger management training was not adequate to address domestic violence.

Under ORS 419B.100(1)(c), jurisdiction is appropriate where "a child's condition or circumstances endanger the welfare of the child." *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 61, 308 P3d 307 (2013). A child's "'welfare' is 'endanger[ed]' within the meaning of the statute if the [child's] conditions and circumstances 'give rise to a current threat of serious loss or injury to the child.'" *Dept. of Human Services v. D. H.*, 269 Or App 863, 866, 346 P3d 527 (2015) (quoting *Dept. of Human Services v. G. J. R.*, 254 Or App 436, 443, 295 P3d 672 (2013) (first brackets in *D. H.*)).

"The key inquiry in determining whether the condition[s] or circumstances warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. C. Z.*, 236 Or App 436, 440, 236 P3d 791 (2010) (internal quotation marks omitted; brackets in original). DHS has the burden to prove that there is a "nexus" connecting the parent's "allegedly risk-causing conduct and the harm to the child" and also that the "risk of harm is present at the time of the hearing and not merely speculative." *Dept. of Human Services v. A. B.*, 264 Or App 410, 416, 333 P3d 335 (2014) (internal quotation marks omitted); *see also Dept. of Human Services v. A. W.*, 276 Or App 276, 280-81, 367 P3d 556 (2016) (jurisdiction was not appropriate where DHS failed to present sufficient evidence to prove a nexus between mother's substance abuse or father's domestic violence and a current risk of harm to the child).

As discussed above, DHS alleged that jurisdiction was warranted based on the likelihood that father would fail to protect A from mother, father's substance abuse, and father's engagement in domestic violence with mother and A. We conclude that there was sufficient evidence to support the juvenile court's explicit and implicit findings and those findings were legally sufficient to support the conclusion that placing A in father's care would pose a current risk of serious loss or injury to A.

With respect to the first allegation in the petition, it is undisputed on appeal that mother caused serious physical injury to S and that, as a result, mother presents a current risk of harm to A. The juvenile court implicitly found that father was likely to fail to protect A from mother, and there was evidence from which the juvenile court could make that finding. Further, based on that finding, the trial court was entitled to conclude that there was a current risk of harm to A if father failed to protect her from mother.

First, DHS presented evidence that father had failed to protect S from mother while S was in their care. Although it is undisputed that father did not cause the injuries to S, father was living with mother in the weeks before the serious injury to S, and the juvenile court could infer that father

would have seen the same bruises on S's face and body that were observed by medical personnel. McPherson testified that mother's explanation for the bruising—S bumping her head on a crib or bumping her head on the ground—did not explain the bruises he observed on S and, rather, he believed they were probably caused by abuse. Father took no action to protect S from mother after seeing the bruises, which in turn supports the court's finding that there was a risk that father would fail to protect A. *See G. A. C. v. State ex rel Juv. Dept.*, 219 Or App 1, 14-15, 182 P3d 223 (2008) (where the mother abused one child through inappropriate discipline, the evidence was sufficient to support jurisdiction as to two other children because the mother's behavior was likely to recur); *State ex rel Juv. Dept. v. T. S.*, 214 Or App 184, 196, 164 P3d 308, *rev den*, 343 Or 363 (2007) (where the mother had failed to take action in response to allegations that the father had raped one child, there was a reasonable likelihood that the mother would fail to protect other children in the household). *Cf. State ex rel SOSCF v. Imus*, 179 Or App 33, 44, 39 P3d 213 (2002) (jurisdiction appropriate where the mother caused bruising to the child through physical abuse and "whether through lack of awareness of the abuse or its causes, lack of effective prevention of the abuse, or for some other reason, father had failed to protect the * * * child from [the] abuse").

Second, DHS presented, through Jayo's testimony, evidence that father did not believe that there were any "issues" with mother's parenting that would have led to the injury to S. Father also took the position at trial that mother had not abused S, and he presented no evidence at the jurisdictional trial showing that he had accepted that mother abused S. Thus, the evidence that father did not appreciate the risk that mother posed to A supports the court's finding that father was likely to fail to protect A from mother. *Cf. Dept. of Human Services v. H. H.*, 266 Or App 196, 205, 337 P3d 929 (2014), *rev den*, 356 Or 837 (2015) (jurisdiction appropriate where the father abused one of parents' children and the mother still lived with the father and also did not "believe that father played a role in harming [the child], [and did] not perceive the need to take steps to protect her children from father").

Parents contend that their separation and potential divorce demonstrates that DHS failed to prove that father will have contact with mother and, therefore, placing A in father's care would not place her at risk. However, parents' current separation alone does not alleviate the risk that father will fail to protect A in the future, and there is no evidence in the record indicating that father had taken any steps in order to protect A from future abuse by mother. Parents did not present any evidence that father had—for example—sought to obtain sole legal custody of A, sought to obtain a restraining order against mother, entered in a voluntary agreement to protect A from mother, or even that he represented that he would not allow A to have unsupervised contact with mother. *Cf. Dept. of Human Services v. R. L. F.*, 260 Or App 166, 169-70, 172, 316 P3d 424 (2013) (DHS failed to prove that the father could not protect the child from the mother because the father did not have sole legal custody—the record showed that the father had sought legal custody and had obtained and enforced a restraining order against the mother); *Dept. of Human Services v. L. G.*, 251 Or App 1, 4, 281 P3d 681, *adh'd to as modified on recons*, 252 Or App 626, 290 P3d 19 (2012) (although the mother did not believe that the father was a risk to abuse the child, jurisdiction was not appropriate, in part, because she testified that she would not leave the child with the father unsupervised and was abiding by DHS requirements that she have no contact with father). Thus, DHS presented evidence to support the juvenile court's finding that father's failure to protect S indicated that he would fail to protect A, and there was nothing in the record to prove that father was prepared to take action to prevent mother from harming A.

Finally, the court concluded that there was a nexus between the likelihood that father would fail to protect A from mother and the risk of harm to A, and DHS presented sufficient evidence to prove that nexus. As discussed above, the parties do not dispute on appeal that mother's abuse of S indicates that she is a risk of harm to A. Further, McPherson testified that the injury to S had been caused by mother's abuse and that A was also at risk of abuse. He explained that, from his experience as a physician, when "one child * * * has been abused in the home severely, it is

not uncommon * * * to learn that other children previously to that, or during that time, have also been abused. So there is risk to any other children living in the home." Thus, the court could conclude that, if father failed to protect A from mother, it would place A at risk of serious loss or injury.

As to the second and third allegations in the petition, DHS presented sufficient evidence from which the court could conclude that father's substance abuse and domestic violence in the presence of A would create a current risk of harm to A if she were to be placed in father's care. Although the harassment incident happened eight months before the trial, the juvenile court found that father had not taken the steps necessary to address the underlying causes of that behavior, and there was evidence in the record to support the court's findings. The juvenile court's findings to that effect, in turn, are legally sufficient to support the court's conclusion that there was current risk of harm to A.

First, the juvenile court found that father was likely still abusing alcohol and was in need of substance abuse treatment, and there was evidence in the record to support the court's finding. Although a substance abuse assessment was alluded to by Smartt and by counsel, it was never made a part of the record. Accordingly, the minimal evidence in the record that father had completed a substance abuse assessment showing that he was not in need of treatment did not compel the juvenile court to find that father had stopped abusing alcohol before the trial. *Cf., e.g., Dept. of Human Services v. E. M.*, 264 Or App 76, 83, 331 P3d 1054 (2014) (jurisdiction inappropriate where, despite testing positive for marijuana and amphetamines while pregnant with the child, mother had had two clean urinalysis tests in the time since the child was born). Moreover, there was evidence in the record that father was still abusing alcohol at the time of the trial; Smartt testified, without objection, that she had received "community reports" that father still had problems with alcohol. *Cf. Dept. of Human Services v. M. Q.*, 253 Or App 776, 786, 292 P3d 616 (2012) (jurisdiction inappropriate where there was no evidence that the father used drugs within the year before the jurisdictional trial). The court was therefore permitted to find that father had not addressed his alcohol abuse and was in need of treatment.

Further, the court implicitly found that father's alcohol abuse was likely to lead him to engage in future domestic violence. Although the record includes direct evidence that father's alcohol use contributed to only one incident of violence, the juvenile court found that mother "minimized" the level of conflict in the home during her testimony. Mother stated that father was often intoxicated, that he became "angry" when he was intoxicated, and that his drinking upset her. In isolation, that evidence would not support jurisdiction, *see State ex rel Dept. of Human Services v. D. T. C.*, 231 Or App 544, 554, 219 P3d 610 (2009) (evidence insufficient to support jurisdiction where, although the father was "mean and 'controlling'" and frightened his children when he drank, there was no evidence that his conduct had been "harmful to the children in the past"), but, in conjunction with father's violent behavior, that evidence supports the court's conclusion that father would likely engage in further violence without treatment.

The court also found that father's anger management training was not adequate to ensure that father would not again engage in domestic violence. Smartt testified, again without objection, that batterer's education would be necessary in order to address the causes of father's behavior. Thus, the juvenile court could permissibly rely on the fact that father had not completed batterer's education to support its finding that father would likely behave violently in the future if he did not receive additional treatment. *Cf. Dept. of Human Services v. L. C.*, 267 Or App 731, 743, 343 P3d 645 (2014) (explaining that a court may continue jurisdiction based on a parent's past conduct if it is "reasonably likely that the parent will engage in that conduct again and will do so in a way that will put the child at risk of serious loss or injury").

Additionally, the juvenile court concluded that there was a nexus between father's alcohol use and domestic violence and a current risk of harm to A, and DHS presented evidence sufficient to prove that nexus. McPherson testified that domestic violence between spouses is a risk factor of child abuse. When father threw the wallet at mother and attempted to take the car keys from her, mother was holding A. The juvenile court could therefore find that the domestic

violence was directed at both mother and A. As the juvenile court observed, mother acted to protect A from that violence by locking herself and A in the bathroom and calling the police. Therefore, the court also permissibly found that any future violence by father would put A at risk of harm because mother would not be able to protect her in the future.

Finally, although substance abuse alone is not sufficient to support jurisdiction, *see C. Z.*, 236 Or App at 442-44 (reversing jurisdictional judgment where there was no evidence to show that the mother's marijuana use created a risk of harm to her children), here, the court found that father's alcohol abuse directly contributed to an incident of domestic violence committed when A was present, and the court also found that he had not taken steps necessary to alleviate his substance abuse problem. Moreover, the court also found that anger management was insufficient to address the risk that father would engage in future violence, and DHS presented evidence that batterer's education was the appropriate treatment. In sum, the juvenile court found that father's past conduct demonstrated that he was dangerous to A and that father had failed to take the steps necessary to address the underlying causes of that conduct. Thus, the juvenile court's findings were legally sufficient to support the conclusion that father presented a current risk of harm to A.

Based on the totality of the circumstances, we conclude that the juvenile court's express and implied factual findings were legally sufficient to support its conclusion that placing A in father's care would put her at risk of serious loss or injury. Accordingly, the court did not err in concluding that the conditions and circumstances endangered A and properly took jurisdiction.

Affirmed.